Dorothea E. Donaldson, J.
In this claim, claimant sought the recovery of damages for personal injuries, conscious pain and suffering and wrongful death of decedents, Cruz Santiago Beyes and Bamona Bivera Beyes, husband and wife, predicated upon the maintenance of a nuisance and on negligence of the New York ¡State Thruway Authority, an agency of the State of New York. Claimant was duly appointed administrator of the estates of both decedents by the Surrogate of the County of New York on August 14, 1962. Decedents left surviving seven children, the eldest at the time of trial being approximately 14 years of age and the youngest being twins 6 years old.
The fatal injuries resulted from an accident which occurred at approximately 5:00 p.m. on the afternoon of July 15, 1961 during a heavy rainstorm near milepost 16.2 north on the west end of the Tappan Zee Bridge of the New York State Thruway. The decedents were passengers in the rear seat of a three-month-old 1961 four-door Oldsmobile sedan, model FA185, with power steering and without power brakes, driven by Daniel Garcia, returning to New York City from an afternoon visit with a relative in Napanoch. The Garcia vehicle was proceeding at 35 miles per hour southbound in the inside (left) passing lane immediately before the occurrence of the accident when the automobile in front showed its stop lights and slowed down. As he felt “ like a dirt road under the tires ”, Mr. Garcia testified, the car skidded to the left, he then tried to control the car, lightly applied the brakes, which did not respond too well so that the *155 vehicle crossed the dividing pavement into the northbound lane where it was struck by two oncoming vehicles. The passengers in the rear seat were catapulted upon the roadbed, sustaining fatal injuries.
The New York State Thruway is a toll, limited access, high-speed roadway for automotive vehicles, composed of a concrete wearing surface, of three traffic lanes proceeding southbound and three traffic lanes proceeding northbound. At a point about 500 feet north of milepost 16.2 south, the size of the concrete traffic ribbon began to narrow from a width of 49 feet at its juncture with an approach road to a width of 37 feet at the milepost. Also, during this distance, the road surface curved to the left in a 2% curve with a radius of 2,850 feet on a minus 2% grade and a bank of 7 inches in the 37-foot width. From this distance to the milepost, there were two types of highway delineators or dividers; the first being a 25-foot-wide grass mall with concrete curbing which, at its termination, had no curbing and changed to a blacktop or asphaltic concrete level-with-the-roadway transition for a distance of 92 feet from whence it continued as a 10-foot-wide beveled concrete paved median strip raised 2% inches above the road’s wearing surface. The west abutment of the Tappan Zee Bridge is at milepost 16.2 north, which is the point at which the Tappan Zee Bridge terminates and the northbound section of the Thruway on the west bank of the Hudson River begins. Due to the radius of the southbound curve, milepost 16.2 south is approximately 18 feet north of the signpost marking milepost 16.2 north. These mileposts are markers set on metal standards on the outside of the shoulders of southbound and northbound outside (slow) traffic lanes of the Thruway. At the point where the blacktop transition began at the southbound uncurbed terminus of the grass mall, the composition of the wearing surface of the northbound and southbound traffic lanes changed from concrete to blacktop pavement. This blacktop pavement, or asphaltic concrete, began approximately 18 feet south of milepost 16.2 south.
The chain of events leading to the accident herein apparently began in the transitional area of concrete-to-blacktop pavement. Between the termination of the grass mall and the beginning of the concrete median, the northbound and southbound lanes were not separated by barricades, dividers or raised curbing but the blacktop surfacing contained painted lines identifying the traffic lanes. A regulation “No U Turn ” traffic sign on a standard in the center of the blacktop transition divider identified ■ the area as one in which official vehicles could change their direction from either north or southbound lane to the other.
*156 At a distance between 1,000 feet and 500 feet north of milepost 16.2 south, on the right shoulder of the southbound lanes of the Thruway, stood a large traffic sign bearing the legend, ‘ ‘ Bridge, 50 MPH ’ ’, the number indicating miles per hour being changed to read “35 MPH” when weather conditions warranted such change. Defendant’s witnesses testified that the miles-per-hour-sign had been changed to read “ 35 MPH” on July 15,1961 due to the downpour of rain.
It is a requirement in New York that the public authority responsible has the duty to give warning of the hazards on highways maintained by it; thus warning signs must be erected whenever necessary and such signs must be reasonably adequate for the intended purpose. (McDevitt v. State of New York, 1 N Y 2d 540.) The question arises whether the defendant failed to have the southbound lanes properly signed to warn drivers that they were approaching a curve. The expert testimony varied whether signing was required by posting on both shoulders of one-direction roadways which had three or more traffic lanes delineated. Although claimant’s expert had qualifications as an authority in the field of traffic engineering in the State of New Jersey and had received national recognition in his field, other traffic experts indicated that the requirement of dual signing was under study and had not arrived at the point of recognized approval or disapproval. Regardless of dual signing, however, the necessity for posting a regulation warning sign showing a curve is determined by the sharpness of the curve. In the opinion of the experts, where road construction engineering reflects a “flat” curve, good traffic engineering practice does not require the erection of a curve sign. The testimony identified the curve in question, hereinbefore described, as a “ flat ” curve.
In accordance with the Manual of Uniform Traffic Control Devices, adopted by the State of New York, where there is a change in composition of materials used for the wearing surface of a roadway, which changes the coefficient of friction, motorists are to be warned 300 feet in advance of such change by the posting of a regulation diamond-shaped sign, bearing the legend ‘ ‘ Slippery When Wet ”. The effect of a heavy downpour on the surface of asphaltic concrete does not necessarily change the coefficient of friction but may create an action whereby oil resulting from traffic use stays on the pavement, and the rainwater lying thereon, on being disturbed by a motor vehicle, “ sloshes ” upward in a manner similar to hydroplaning. This type of action does not increase the slipperiness of the pavement. An experienced motorist is aware that the wearing surface of a *157 roadway is more slippery in normally wet weather than it is in normally dry weather. Customary engineering practices in effect in 1961 did not classify a road as slippery where the coefficient of friction met the Eshot standards. It is claimant’s contention that proof of prior accidents in the vicinity of the instant accident in similarly wet circumstances is sufficient to support the duty of the defendant to erect signing in accordance with the requirement stated in the Manual of Uniform Traffic Control Devices as follows: ‘ ‘ This sign is provided for use as a warning only on pavements which, when wet, become extraordinarily slippery. ’ ’ Reports were submitted to show that during wet weather there were two accidents recorded within the year prior to July 15, 1961 that occurred near or at milepost 16.2 north and that there were a total of five accidents during that period in its vicinity. Unless all the causative factors in one or all of the prior accidents were identical with the instant claim, proof thereof does not constitute notice or reflect a conclusion that the blacktop pavement was so £ ‘ extraordinarily slippery ’ ’ in wet weather as to require signing in accordance with the manual. It is noted, parenthetically, that more than 10,000,000 motor vehicles, according to traffic count, traversed the Tappan Zee Bridge and the adjoining Thruway in both directions during the year prior to July 15,1961, during a variety of weather conditions. Whether an untraversable barrier, such as a 32-inch-high concrete wall or a back-to-back guardrail or a parabolic-shaped curb, any one of which might be strong enough and high enough to withstand a motor vehicle forced against it from going over it into approaching traffic lanes, should have been constructed as a center island rather than the blacktop transition area hereinbefore described as open for the turning of official vehicles, is a matter which is still under study by traffic engineers. It is good traffic engineering practice where there is a nontraversable barrier on a bridge or a bridge approach to provide £ ‘ breaks ” or spaces in certain locations for ££ U-Turn ” use by police and official authorities. Traffic authorities have not yet drawn definite conclusions following Nationwide studies of designs of median barriers whether a nontraversable type provides sufficient protection for safety in accordance with good traffic engineering practice.
The State has a duty effectively to inspect and maintain the highway under its jurisdiction. (Boyce Motor Lines v. State of New York, 280 App. Div. 693, affd. 306 N. Y. 801.) However, it is not necessary for the State to have notice of faulty construction, maintenance or repair of its highways, as £ £ the State is deemed to know of its own acts ”. (Coakley v. State of New *158 York, 26 Misc 2d 431, 435, affd. 15 A D 2d 721.) The claim herein, though, contains no proof that the State was negligent in the construction (in particular, the curve and blacktop pavement), maintenance (dirt), or repair of the Thruway.
Assuming, arguendo, that the claimant proved that the defendant had breached a duty, it must still be shown that the negligence of the State was the proximate cause of the damages alleged. (Bertram v. State of New York, 282 App. Div. 415, affd. 306 N. Y. 913.) Although the claimant in a wrongful death claim is not held to as high a degree of proof as is required when the injured party is able to describe the accident (Noseworthy v. City of New York, 298 N. Y. 76), the State is not the insurer of the safety of its highways (Kirchner v. State of New York, 223 App. Div. 543). “ Negligence cannot be inferred from the fact that the car skidded or that the accident happened”. (Wesley v. State of New York, 272 App. Div. 990; Lahr v. Tirrill, 274 N. Y. 112.)
Claimant has failed to sustain the burden of proof that the State maintained a nuisance in its failure to perform a duty which tended to render dangerous a highway or in negligence resulting from the improper construction and maintenance of the roadway. The claim must be, and hereby is, dismissed.